No. 87-361

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

MONTE VISTA COMPANY, a Montana
Corporation,

       Plaintiff and Appellant,

  -vs-

THE ANACONDA COMPANY, a Delaware
Corporation, and WILLIAM G MOUAT,
individually and as agent,

       Defendants and Respondents.

---

APPEAL FROM:  District Court of the Thirteenth Judicial District,
In and for the County of Stillwater,
The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Robert Edd Lee; Crowley, Haughey, Hanson, Toole
and Dietrich, Billings, Montana

    For Respondent:

        Rockwood Brown; Anderson, Brown, Gerbase, Cebull,
Fulton, Harman and Ross, Billings, Montana (Anaconda)
William H. Bellingham; Moulton, Bellingham, Longo
and Mather, Billings, Montana (Mouat)

---

             Submitted:  April 8, 1988

              Decided: May 4, 1988

Filed:    MAY 4 - 1988

_Ethel M. Harrison_

—————————————————————————
             Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

In December 1980, plaintiff and appellant Monte Vista brought this action alleging breach of contract and seeking declaratory judgment and contract reformation. On May 23, 1983, Monte Vista filed an amended complaint which added claims for interference with economic advantages, bad faith, civil conspiracy and punitive damages. Subsequently, appellant Monte Vista and respondents Anaconda Company and William Mouat filed numerous motions, including counter- and cross-claims and motions for summary judgment. On March 16, 1987, the Thirteenth Judicial District Court, Stillwater County, granted respondents' motions for summary judgment against Monte Vista. From that order, Monte Vista appeals.

On appeal, Monte Vista raises six issues for our review. We have restated the issues as follows:

1. Did the District Court properly determine that Monte Vista's leasehold interests under the "A" lease were lawfully terminated by reason of its failure to produce and its payment of "minimum rentals" for over three consecutive years?

2. Did the District Court properly determine that Monte Vista's leasehold rights under the "B" lease expired by reason of Monte Vista's failure to renew the optional five-year term?

3. Did the District Court abuse its discretion when it granted summary judgment against Monte Vista's claims of interference with economic advantages, bad faith, civil conspiracy and punitive damages?

Prior to World War I, M. W. Mouat, the forebear and predecessor in title of the Mouat respondents, began locating mining claims in the "Stillwater Complex" located in Stillwater County, Montana. The Stillwater Complex is an area

2

of large mineral reserves located at the northern edge of the Beartooth Mountains. The Stillwater Complex contains anomalous concentrations of integrated minerals including copper and nickel sulfides, chromites and platinum sulfides. From the 1920s through the 1940s, M. W. Mouat was active in the Stillwater Complex and accumulated a significant holding of both patented and unpatented mining claims.

During World War II, the United States government condemned certain mining properties in the Stillwater Complex, including the Mouat interests, for the production of chrome. Subsequent to World War II, M. W. Mouat and his heirs engaged in litigation to recover their condemned property. Ultimately, most of the mining properties were returned to the Mouat family.

During the 1950s and until 1962, the Mouats leased the chrome mine developed during World War II to American Chrome Company. American Chrome produced and stockpiled chrome concentrates for national defense purposes under a subsidized contract with the United States government. American Chrome constructed a mill for processing chrome ores that was located on the Mouats' condemned Stillwater mineral properties.

Following a one-year hiatus, in 1963 the Mouats leased a portion of the Stillwater mineral properties to Monte Vista. On May 1, 1963, Monte Vista, as lessee, entered into three agreements with the Mouat family, as lessor. In 1964, Monte Vista suffered serious financial difficulties and was forced to renegotiate the Stillwater leases. On July 30, 1964, the parties executed an agreement modifying and amending the 1963 contracts.

The May 1, 1963, agreements included: (1) Mine Lease "A"; (2) Mine Lease "B"; and (3) the "Industries Agreement." Under Mine Lease "A", Monte Vista leased the "Mouat Chrome Mine" and all property situated on or within the mining

3

claims constituting the Mouat chrome mine, for fifty years, subject to certain provisions. The pertinent provisions of Mine Lease "A" are as follows:

> [This lease shall remain in effect for fifty (50) years <u>and</u> <u>so</u> <u>long</u> <u>thereafter</u> <u>as</u> lessee shall:]
>
> (a) <u>in</u> <u>each</u> <u>succeeding</u> <u>consecutive</u> <u>18</u> <u>month</u> <u>period</u> <u>produce</u> <u>or</u> <u>ship</u> <u>chrome</u> <u>ores</u> and/or chrome concentrates in commercial quantities obtained from the leased premises; or
>
> (b) <u>continue</u> <u>Monte's</u> <u>operations</u> as the term "Monte's operations" is defined in Section IV-Royalties and Rentals, of this lease; or
>
> (c) <u>keep</u> <u>in</u> <u>force</u> <u>and</u> <u>effect</u> <u>the</u> "lease of all other chromite claims" between Lessors herein, as lessors, and Lessee herein, as lessee, which said lease is of even date herewith and more particularly described in the Agreement of even date herewith between Lessors Mouat Industries, Inc., and Monte (said lease being hereinafter called <u>"B"</u> <u>lease</u>).

Paragraph II, pp. 4-5, Mine Lease "A".

> The term "<u>Monte's</u> <u>Operations</u>" as used in subparagraph B of Section IV means <u>Monte's</u> <u>manufacture</u> <u>of</u> <u>sodium</u> <u>chromate,</u> <u>sodium</u> <u>biochromate,</u> <u>potassium</u> <u>chromate</u> <u>or</u> <u>potassium</u> <u>bichromate</u> <u>and</u> <u>other</u> <u>chrome</u> <u>chemicals</u> derived by Monte from sodium chromate or sodium bichromate manufactured by Monte, including the usual by-products of such manufacture, at locations that can be reasonably and economically supplied with chromite obtained from the Stillwater Complex; <u>and</u> <u>its</u> <u>mining,</u> <u>processing,</u> <u>and</u> <u>trans-</u> <u>porting</u> <u>of</u> <u>chromite</u> <u>raw</u> <u>materials</u> <u>for</u> <u>such</u> <u>manufacture.</u> [Emphasis added.]

Paragraph III B, p. 8, Mine Lease "A".

Mine Lease "A" required Monte Vista to pay the Mouats a royalty calculated by means of a formula based on production of ores and concentrates plus a rental based on a percentage of the profits derived by Monte Vista from "Monte's Operations." Mine Lease "A" also provided for the payment of "minimum rentals" to the Mouats should mining operations by Monte Vista be "totally suspended" as defined as follows:

> C. Minimum Rentals under Total Suspended Operations:
>
> No minimum rentals shall be payable under this lease as long as:
>
> (a) in any consecutive eighteen (18) month period, Lessee shall produce or ship ores and/or concentrates in commercial quantities obtained from the leased premises, or
>
> (b) Lessee is continuing Monte's operations as hereinbefore defined; or
>
> (c) the B lease shall be in force and effect.
>
> In the event that ores or concentrates are not produced in any period of eighteen (18) consecutive months in commercial quantities, and the B lease has terminated, and Monte's operations are suspended (such conditions being collectively called "total suspended operations"), as of the first day of any annual accounting period, as hereinbefore defined, and such total suspended operations shall continue to exist for a period of not less than ninety (90) days thereafter, Lessee shall pay to the Lessors a minimum rental in lieu of royalty payable under this lease as follows:
>
> (i) $750.00 per calendar month until the first annual accounting period of total suspended operations; and,

5

> (ii) $1,250.00 per calendar month during each succeeding annual accounting period of total suspended operations.
>
> . . .
>
> <u>At any time from and after the end of the third full successive year of the accrual of minimum rentals hereunder, the Lessors may terminate this lease upon ninety (90) days' notice in writing to Lessee.</u> [Emphasis added.]

Paragraph III C, pp. 11-12, Mine Lease "A".

Under Mine Lease "B", Monte Vista leased Mouats' remaining chromite mining claims in the Stillwater Complex. Mine Lease "B" was renewable each five years upon giving the Lessor not less than ninety days notice in writing. Royalties due the Mouats under Mine Lease "B" were based on amounts of ore or concentrate produced, similar to Mine Lease "A". The method of calculating minimum rentals, however, was much simpler than under Mine Lease "A". Mine Lease "B" provided that Monte had an obligation to pay a minimum rental ". . . if royalties from said premises for said calendar month, and for any calendar month thereafter, do not equal or exceed the sum of $2,000.00, the Lessee shall pay on or before sixty days following the end of each such calendar month, such sum as may be necessary to equal the difference between royalty payments payable for such month and $2,000 . . ." Paragraph IV, p. 7, Mine Lease "B".

The "Industries Agreement" was the third agreement entered into between Monte Vista and the Mouats. This agreement provided for the sale of the Mouat Chrome Chemical Plant at Columbus. The Industries Agreement also provided for the sale of additional patented mining claims. Mine Leases "A" and "B" were incorporated as "integral and essential" parts of the "Industries Agreement."

6

Following the May 1, 1963, execution of the Stillwater leases, Monte Vista encountered severe financial difficulties. By July 1964, Monte Vista was $14,000 in arrears in Mine Lease "B" minimum rental payments. Per Monte Vista's request, the parties, on July 30, 1964, executed a "Letter of Agreement," (1964 Amendments) which modified and amended the 1963 contracts.

Pertinent provisions of the 1964 Amendments are as follows:

> Amendment No. 4. Beginning August 1, 1964, the monthly rental payable under the "B" Lease of May 1, 1963, shall be changed from a rental of $2,000 per month to a rental of $10 per month.
>
> Amendment No. 7. For the purpose of determining minimum rentals under "A" Lease under Total Suspended Operations, as described in "C" of Part IV of the "A" Lease, the "B" Lease shall be considered in full force and effect until July 31, 1964. Beginning with August 1, 1964, and the commencement of $10 per month rentals under the "B" lease, the said $10 per month rental payments, while keeping in full force and effect the "B" Lease, will not eliminate the necessity of Monte Vista making minimum rental payments to the Lessors as such may be required by the other provisions of the "A" Lease. [Emphasis added.]

Pursuant to the 1964 Amendments, Monte Vista was granted additional time to pay arrearages for minimum rentals under Mine Lease "B". Additionally, royalties payable to the Mouats under Mine Lease "A" were changed from 20 percent to 10 percent of net profits.

In December 1968, the Mouats assigned all their rights, title and interests in the Stillwater mining leases to the Anaconda Company (Anaconda). In October 1980 Anaconda, as

7

lessor, served its notice of termination of the lease agreements on Monte Vista, thereby precipitating this lawsuit.

## Mine Lease "A"

As mentioned earlier, the term of Mine Lease "A" was fifty years and so long thereafter as Monte Vista had: (1) shipped ores obtained from the lease premises in each succeeding consecutive eighteen-month period; or (2) continued "Monte's operations" (mining, processing, transporting and manufacturing of chromite raw materials); or (3) kept in force and effect Mine Lease "B". These conditions were collectively referred to as "total suspended operations."

Mine Lease "A" also granted the Mouats the right to terminate the lease after three successive years of the accrual of minimum rentals. Minimum rentals were not payable, however, until all of the three conditions comprising total suspended operations occurred.

Following the 1964 Amendments, Mine Lease "B" minimum monthly rentals were reduced from $2,000 to $10. Although Mine Lease "B" remained in full force and effect by payment of $10 per month, the 1964 Amendments provided "the "B" Lease will not eliminate the necessity of Monte Vista making minimum rental payments to the Lessors as such may be required by the other provisions of the "A" Lease." In summary, "total suspended operations" under Mine Lease "A" would be triggered by Monte Vista's failure to meet two conditions instead of the previous three.

Pursuant to Mine Lease "A" and the 1964 Amendments, Monte Vista was obligated to make minimum rental payments if, (1) Monte Vista did not ship ore in any eighteen-month period, and (2) Monte Vista discontinued operations. Following an additional ninety-day period of total suspended operations, Monte Vista would be obligated to pay minimum rentals

8

in lieu of royalties as long as total suspended operations existed.

Monte Vista began paying minimum rentals in February 1966. Three years later, Monte Vista began a two-month production of chrome ores and made two royalty payments. Thereafter, Monte Vista was not required to make minimum rental payments for eighteen months. In February 1971 Monte Vista resumed minimum rental payments.

On October 2, 1980, Anaconda, citing the passage of more than three successive years of the accrual of minimum rentals, served Monte Vista with its notice of termination of Mine Lease "A".

Monte Vista contends the District Court erred when it found (1) that Monte Vista was in a state of total suspended operations, and (2) that even if Monte Vista was in a state of total suspended operations, minimum rentals never accrued for more than three years because Monte Vista always paid the minimum rentals as they became due.

On review, we must determine if the District Court properly held there was no contractual ambiguity and that respondents were entitled to summary judgment as a matter of law. Section 28-2-905, MCA; Rule 56(c), M.R.Civ.P. Previously we held that, when interpreting contracts, it is a question of law whether there is an ambiguity sufficient to submit the issue to a jury. Nordlund v. School Dis. No. 14 (Mont. 1987), 738 P.2d 1299, 1301, 44 St.Rep. 1183, 1185. An ambiguity exists when a contract is subject to two interpretations and parol testimony can be used to determine what the parties intended. Martin v. Laurel Cable TV, Inc. (Mont. 1985), 696 P.2d 454, 457, 42 St.Rep. 314, 317; S.W. Co. v. Schwenke (1977), 176 Mont. 546, 552, 568 P.2d 145, 147. However, intent of the parties is only looked to when the agreement in issue is not clear on its face. Glacier

9

Campground v. Wild Rivers, Inc. (1979), 182 Mont. 389, 394, 184 Mont. 543, 547, 597 P.2d 689, 692. Where the contractual language is clear and unambiguous on its face, it is this Court's duty to enforce the contract as drafted and executed by the parties. Wortman v. Griff (1982), 200 Mont. 528, 536, 651 P.2d 998, 1002.

Appellant contends that Monte Vista was <u>never</u> in a state of total suspended operations because (1) Mine Lease "B" was never terminated, and (2) Monte Vista never commenced the manufacture of chemical compounds defined in Mine Lease "A" under "Monte's Operations."

Monte Vista's argument that its operations were never totally suspended because the operations were never started totally ignores the 1964 Amendments. Amendment 7 provides that Mine Lease "B", "while keeping in full force and effect . . . will not eliminate the necessity of Monte Vista making minimum rental payments to the Lessors . . ." Additionally, Mine Lease "A", Paragraph III C, p. 12, provides: "At any time from and after the end of the third successive year of the accrual of minimum rentals hereunder the Lessors may terminate this lease . . ." When Anaconda terminated Mine Lease "A" in 1980, Monte Vista had paid minimum rentals in excess of three years.

It is fundamental when reviewing contractual disputes that we are required to read the entire contract together and give effect to every part, if reasonably practicable. Section 28-3-202, MCA; Bender v. Rookhuizen (Mont. 1984), 685 P.2d 343, 346, 41 St.Rep. 1418, 1422. Additionally, when a contract is clear and unambiguous, as is Mine Lease "A" and Amendment 7, we are required to enforce the contract as written. <u>Wortman</u>, 200 Mont. at 536, 651 P.2d at 1002. Amendment 7, when read together with Mine Lease "A", clearly

indicates that respondent Anaconda acted within its contractual rights when it terminated Mine Lease "A".

Monte Vista next contends that even if we agree with the District Court that Monte Vista was in a state of total suspended operations, minimum rentals never accrued for more than three years. Monte Vista supports its contention by citing that it always paid the minimum rentals as they became due. Therefore, Monte Vista argues the minimum rentals were paid and could not accrue.

Mine Lease "A", Paragraph IV C, provides:

> At any time from and after the end of the third full successive year of the accrual of minimum rentals hereunder, the Lessors may terminate this lease upon ninety (90) days' notice in writing to the lessee. [Emphasis added.]

We agree with the District Court that "accrual of minimum rentals" is not limited to accrual of minimum rental debts. Rather, accrual of minimum rentals simply means accrual of paid or unpaid minimum rentals. When determining this issue, we are guided by the proposition that words of a contract must be interpreted by their ordinary and popular meaning. Rumph v. Dale Edwards, Inc. (1979), 183 Mont. 359, 369, 600 P.2d 163, 168; § 28-3-501, MCA.

Additionally, we note that in 1969, Monte Vista attempted to avoid minimum rental payments and termination under Mine Lease "A" when it began a two-month production of chrome ores and made two royalty payments. Monte Vista's two-month production of chrome ores occurred precisely three years after Monte Vista commenced making minimum rental payments. Where the language of a contract is doubtful and ambiguous, as Monte Vista contends, the conduct of the parties is often the best indication of the parties' intentions and the true meaning of the contract. See Souders v.

11

Montana Power Co. (1983), 203 Mont. 486, 493, 662 P.2d 289, 291.

If, arguendo, we accept appellant's argument that "accrual of minimum rentals" is an ambiguous term, this issue would be determined in an identical manner. In Energy Oils, Inc. v. Montana Power (9th Cir. 1980), 626 F.2d 731, 735, the Ninth Circuit Court of Appeals, in applying Montana contract law, stated:

> The primary function of judicial inter-pretation is to ascertain and give effect to the intention of the parties as expressed in their writing [taking] into consideration the writing itself, its purpose and the circumstances lead-ing up to and attending its execution, endeavor[ing] to ascertain what the parties purposed and intended by their agreement.

A careful review of the record reveals undisputed evidence that the Mouats entered into the 1963 contracts expecting the leased properties would be developed, and chrome ore and chemicals produced so that the Mouats would receive production royalties. If we accept appellant's interpretation of the lease, appellant would be able to control Mine Lease "A" until 2013 without paying production royalties. Clearly, the parties' intentions would not be fulfilled by such an interpretation. Accordingly, we hold the District Court properly found that respondent Anaconda lawfully terminated Mine Lease "A".

## Mine Lease B

Mine Lease "B" provides that Monte Vista pay up to $2,000 per month minimum rentals if production royalties were less than $2,000 per month. Mine Lease "B", unlike Mine Lease "A", does not have a "total suspended operations"

12

provision. However, the "B" lease could be only renewed "by giving the Lessors notice in writing . . . not less than ninety days prior to the expiration of [each] 5 year term."

On May 1, 1983, Mine Lease "B" was scheduled to expire. Monte Vista failed to provide lessor Anaconda with written notice ninety days prior to the expiration date stating Monte Vista's intent to renew. We agree with the District Court that appellant provided no evidence that Monte Vista gave Anaconda such notice. Therefore, Mine Lease "B" expired at the end of the five-year term.

Monte Vista contends that Anaconda wrongfully terminated Mine Lease "B" after the commencement of the Mine Lease "A" litigation. Monte Vista cites the six elements of estoppel and argues that respondent should be estopped from terminating Mine Lease "B" due to alleged constructive fraud and equitable considerations. See Sweet v. Coburn (1982), 196 Mont. 367, 373, 639 P.2d 521, 524. To support its contention, Monte Vista cites Anaconda's January 13, 1981, letter which allegedly lulled Monte Vista "into proceeding with payments on Mine Lease B pending determination of this proceeding."

In its January 13, 1981, letter, Anaconda directed Monte Vista to make its $10 minimum rental payments to the Stillwater County Clerk of Court. Respondent also stated that it would "continue to accept any minimum rentals tendered by Monte Vista under Mine Lease B." We agree with the District Court that Anaconda's offer to continue accepting the Mine Lease "B" rental payments did not waive Monte Vista's duty to provide respondent with written notice of its right to renew.

### Claims for Economic Advantanges, Bad Faith, Civil Conspiracy and Punitive Damages

Monte Vista brought the above-mentioned claims in Counts IV through VII of its amended complaint. On June 7, 1983, Anaconda filed a motion for a more definite statement. Anaconda, in its motion for summary judgment, renewed its earlier objections regarding the lack of factual support for Counts IV through VII.

On December 20, 1984, Monte Vista filed a thirty-five page brief with forty-three attached exhibits in response to Anaconda's request for a more definite statement. The District Court found that Monte Vista again failed to specifically address Anaconda's request for specificity and counter Anaconda's legal arguments. The District Court then stated, "apparently Monte has either elected to abandon these counts or believes that the Court will accept Monte's exhaustive polemic diatribes in lieu of substantive argument."

We agree with the District Court that Monte Vista repeatedly failed to provide, with particularity, factual support for its allegations of fraud. Rule 9(b), M.R.Civ.P. Monte Vista also repeatedly failed to provide the District Court with a simple, concise and direct pleading. Rule 8(e), M.R.Civ.P. The record also supports the District Court's finding that Monte Vista failed to demonstrate a genuine issue of material fact and that Monte Vista has merely relied on lengthy but unsupported allegations. Rule 56(c), M.R.Civ.P.; see, Larry C. Iverson, Inc. v. Bouma (1981), 195 Mont. 351, 373, 639 P.2d 47, 59.

Accordingly, we hold the District Court properly granted summary judgment against Monte Vista on its allegations of fraud, civil conspiracy and bad faith.

The judgment of the District Court is affirmed.

_J. A. Turnage_
Chief Justice

14

We concur:

_John Conway Harrison_

_[signature]_

_L. C. Gulbrandson_

_William E. Hunt, Jr._

_B. C. McDonough_

Justices

_Frank I. Haswell_
Hon. Frank I. Haswell, Retired
Chief Justice, sitting in place
of Mr. Justice John C. Sheehy

15