The BLACKFEET TRIBE OF THE BLACKFEET INDIAN RESERVATION, in its own behalf and on behalf of its tribal program, The Blackfeet Home Program, and The Blackfeet Home Program, Inc., Plaintiffs,

v.

BLAZE CONSTRUCTION, INC.; Lodgebuilder Management, Inc.; and National Union Fire Insurance Company of Pittsburgh, PA, Defendants,

and

National Union Fire Insurance Company of Pittsburgh, PA., Third Party Plaintiff,

v.

William H. Aubrey, Sun All, Inc., Sage Farm Investments, Inc., and Babb, Inc., Third Party Defendants.

No. CV–95–082–GF–RFC.

United States District Court, D. Montana, Great Falls Division.

Aug. 8, 2000.

William J. Gregoire, Stephanie A. Hollar, Smith, Walsh, Clarke & Gregoire, Great Falls, MT, for United States, ex. rel., plaintiff.

Ward E. Taleff, Alexander Baucus Taleff & Paul, Great Falls, MT, for Blaze Construction Inc., defendant.

Gary M. Zadick, Ugrin, Alexander, Zadick & Higgins, PC, Great Falls, MT, Laurence M. McHeffey, McElroy, Deutsch & Mulvaney, Denver, CO, Louis A. Modugno, James M. Mulvaney, McElroy, Deutsch & Mulvaney, Morristown, NJ, for National Union Fire Insurance Company of Pittsburgh, PA, defendant.

James M. Mulvaney, McElroy, Deutsch & Mulvaney, Morristown, NJ, for National Union Fire Insurance Company of Pittsburgh, PA, cross-claimant.

Frank C. Porada, Laurence M. McHeffey, McElroy, Deutsch & Mulvaney, Denver, CO, James M. Mulvaney, McElroy, Deutsch & Mulvaney, Morristown, NJ, for National Union Fire Insurance Company of Pittsburgh, PA, third-party plaintiff.

## MEMORANDUM AND ORDER

CEBULL, United States Magistrate Judge.

This case arose from disputes relative to various contracts and agreements involving the construction, administration and management of homes on the Blackfeet Indian Reservation. Plaintiffs, the Blackfeet Tribe of the Blackfeet Indian Reservation, in its own behalf and on behalf of its tribal programs, The Blackfeet Home Program and the Blackfeet Home Program, Inc. (collectively "plaintiffs"), instituted the above-entitled action against defendants, Blaze Construction, Inc. ("Blaze"), Lodgebuilder Management, Inc. ("Lodgebuilder") and National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), seeking monetary damages. In their Third Amended Complaint, plaintiffs allege nineteen separate counts. Plaintiffs allege National Union is liable for the following:

1) Blaze's alleged breach of the 1992 Contract by its failure to, among other things, provide private mortgage financing for all tenants and to provide a $1.3 million fund for management and administration (Count One);

2) Blaze's alleged breach of warranty under the 1992 Contract because the homes were not built for the particular purpose for which Blaze represented them to be (Count Two);

3) Blaze's alleged negligence in performing the 1992 Contract (Count Three);

4) Blaze's alleged breach of warranty under the 1992 Contract because the homes were not built in a workmanlike manner (Count Four);

5) Lodgebuilder's alleged breach of the Management Contract (Count Six);

6) Blaze and Lodgebuilder's alleged breach of contract in failing to manage the Home Units and Last Star Units in accordance with good management practices (Count Seven);

7) Blaze and Lodgebuilder's alleged negligence in managing the home units and the Last Star units (Count Eight);

8) Blaze's alleged breach of the 1994 Contract (Count Nine); and

9) Blaze's alleged negligence and breach of contract in designing the home units (Counts Ten and Eleven).

In addition to the foregoing counts, plaintiffs further allege Blaze and Lodgebuilder are liable for the following:

1) Blaze's alleged conversion of Super Good Cents funds (Count Five);

2) Blaze and Lodgebuilder's alleged conversion of property and equipment belonging to plaintiffs (Count Thirteen);

3) Aubrey's alleged fraudulent representations to plaintiffs (Count Fourteen);

4) Aubrey's alleged negligent misrepresentations to plaintiffs (Count Fifteen);

5) alleged bad faith in constructing, administering and managing the Blackfeet Home Project and the Last Star Project (Count Sixteen);

6) allegedly presenting false payment vouchers in violation of 25 U.S.C. § 88 (Count Seventeen);

7) alleged RICO violations (Count Eighteen); and

8) punitive damages based on alleged acts of malice, recklessness, oppression and fraud (Count Nineteen).

National Union, Blaze and Lodgebuilder have alleged counterclaims seeking monetary damages based upon plaintiffs' purported breach of contract, breach of the implied covenant of good faith and fair dealing and interference with contract.

Presently before the court are: (1) National Union's motion for summary judgment with regard to all counts asserted against it; and (2) the motion of Blaze and Lodgebuilder for summary judgment with regard to all counts asserted against them.

Having reviewed the record, together with the parties' briefs in support of their respective positions, the court is prepared to rule.

## BACKGROUND[1]

### A. *Blaze, the 1992 Grant Application and the Blackfeet Tribe*

In 1992, William Aubrey, an enrolled member of the Blackfeet Tribe and co-owner of Blaze, approached the Blackfeet Tribal Business Council, the Tribe's governing body, proposing that the Tribe submit grant applications to the United States Department of Housing and Urban Development ("HUD") for funds under HUD's "Indian HOME Program."

On April 30, 1992, the 90'–92' Tribal Council voted to permit Blaze to submit a Partnership Program grant application to HUD. Thereafter, the Council decided that Blaze would not only be responsible for submitting the grant applications, but that Blaze would also be responsible for the "complete project through to final comple-

---

**1.** The facts of this case are well known to the court and the parties. Much of this summary comes from National Union's Statement of Uncontroverted Facts submitted in support of its motion for summary judgment. The other parties have adopted, in substantial part, and relied upon National Union's statement of the facts in their own submissions to the court relative to the pending motions. Blaze and Lodgebuilder, in addition to submitting their own Statement of Uncontroverted Facts, have adopted National Union's statement in its entirety, except to the extent it asserts that plaintiffs made any overpayment to Blaze and Lodgebuilder. Plaintiffs also have submitted Statements of Genuine Issues of Fact in opposition to the respective summary judgment motions of National Union and Blaze and Lodgebuilder. Certain facts related to specific claims are not discussed here, but are discussed in the appropriate part of the "Discussion" section of this Memorandum and Order.

tion with the approved budgetary limits." The Council decided, however, that the Blackfeet Tribe would have auditing and monitoring authority throughout the project.[2]

After the 92'–94' Council was elected, Blaze requested permission to submit more than one grant application on behalf of the Blackfeet Tribe. On July 22, 1992, the 92'–94' Council decided to permit Blaze to submit more than one grant application.

On or about August 15, 1992, Earl Old Person executed, on behalf of the Blackfeet Tribe, a HUD grant application ("1992 Grant Application"), which was subsequently submitted to HUD's Denver office.

At or about the time the Blackfeet Tribe submitted the 1992 Grant Application, the 92'–94' Council created the Blackfeet Home Project ("Home Program"), a nonprofit organization, to administer the HUD grant awards, if any. According to the 92'–94' Council, the Home Program was the project sponsor/developer and was to be responsible for overseeing and managing all phases of the project through its completion. Specifically, the Home Program was responsible for "tenant selection, tenant collection, education, training, plans, specifications, bids, contracts, inspections, all monitoring, audits, maintenance, financing and any other areas of control." On October 6, 1992, Joe McKay and Cynthia Kipp, two members of the 92'–94' Council, became co-directors of the Home Program and were authorized by the 92'–94' Council to sign all pertinent documents required to implement the Home Program.

### B. *1992 Grant Awards and Blaze's Contract with Home Program*

In or about early October 1992, HUD notified the Blackfeet Tribe that it had

been awarded two grants. The first grant, No. M92IG910002, was in the amount of $2,523,000 for the construction of approximately 33 homes. The second grant, No. M92IG10003, was in the amount of $2,993,538 for the construction of approximately 35 homes. As a result, the Blackfeet Tribe received total 1992 grant awards in the sum of $5,516,538.

In its award letters to the Blackfeet Tribe, HUD advised the Blackfeet Tribe that the "Home Investment Partnership Act Grant Agreement (form HUD–52570) which, together with [the 1992 Grant Application] and the regulations at 24 C.F.R. Part 92, Subpart M, constitute the contract between HUD and the Blackfeet Tribe."

After the Blackfeet Tribe received the grant award notices, it requested proposals for construction of the housing units. On October 19, 1992 the Blackfeet Tribe issued an amended Notice to Bidders ("Notice") that provided, in pertinent part, that the Blackfeet Tribe sought bids for general construction of 72 dwelling units. The Notice also provided that potential bidders had an option and were encouraged to submit an "Innovative Proposal" that considered "innovative means of assistance to the Tribe in all forms of management, long and short term."

In response to the Notice, Blaze, the sole bidder, submitted two proposals. One proposal, which was dated November 6, 1992, was entitled "Form of Proposal." In the Form of Proposal, Blaze offered to construct seventy-two (72) housing units for a Total Development Price of $5,990,-000. The Total Development Price included dwelling and non-dwelling construction and equipment, allowances, taxes and "other."

The second proposal was entitled "Innovative Proposal." Blaze proposed that it

---

2. In mid-June 1992, the Blackfeet Tribe held its biannual elections. Earl Old Person and Al Potts were the only members of the 90'–92' Council that were re-elected to the Council. In addition to Messrs. Old Person and Potts, Lee Wilson, Joe McKay, Don Magee, Cynthia

Kipp, Marlene Bear–Walter, George Running Wolf, and Franklin Comes At Night (collectively "92'–94' Council") were also elected. The newly elected 92'–94' Council continued to support the previous Council's decision to seek HUD grant funds.

would "design, construct, manage, counsel tenants, monitor tenant payments and tenant property upkeep, financing, closing and other mortgage requirements, audits, accounting and turn over to tenants for a cost of $87,000 per unit." The Innovative Proposal provided, in relevant part, that Blaze would, without financial assistance from the Blackfeet Tribe, construct 72 homes, "obtain and manage all other (non-government) monies or contributions required for additional units beyond the 63 homes funded by" the 1992 HUD home grants. The Tribe accepted the Innovative Proposal.

On or about December 2, 1992, the Home Program and Blaze executed a Form of Contract. The Innovative Proposal was an addendum to the Form of Contract and was incorporated by reference therein. Also on December 2, 1992, Blaze and the Home Program executed a Blackfeet Home Program Development Contract ("1992 Contract"). The 1992 Contract incorporated by reference two attachments.

The first attachment, Attachment 'A,' indicates that it is for "[i]tems of work not included in the Plans & Specifications or the Form of Contract." Those items included, but were not limited to,

1) tenant selection,

2) tenant training,

3) private mortgage financing for all tenants,

4) a $1,300,000 minimum reserve account for the purpose of mortgage insurance, 20 year management and maintenance, or for additional new housing units,

5) providing an application for FHLB AHP grant,

6) secure land needed and approved by the Home Program,

7) obtain financial assistance for qualifying tenants, and

8) monitoring tenant payments.

The second attachment, Attachment 'B,' was a Home Program Budget ("Budget").

## C. *1992 Bond and Progress Under the 1992 Contract*

On or about December 2, 1992, National Union, as surety, issued a performance and payment bond ("1992 Bond") on behalf of Blaze, as principal, in favor of the Home Program, as obligee. The 1992 Bond, which was required by HUD regulation, was in the amount of the grant awards, $5,516,538. The day after National Union issued the 1992 Bond, the Home Program issued to Blaze a Notice to Proceed with construction work under the 1992 Contract. The Notice to Proceed purported to establish a completion date of October 5, 1993.

Shortly thereafter, Blaze commenced construction pursuant to the 1992 Contract. By late 1993, Blaze had constructed 51 housing units. According to plaintiffs, Blaze constructed twenty-four (24) units in East Glacier, twenty four (24) units in a subdivision called Mountain View in Browning and three (3) units on scattered sites. As construction progressed, representatives from Glacier Electric and the Blackfeet Tribe inspector, Bill Salois, inspected the homes. After homes were completed, Mr. Salois issued certificates of occupancy to tenants. During his deposition, Mr. Salois testified that he inspected all phases of construction. He further testified that the homes were built according to the Uniform Building Code and the 1992 Contract requirements.

As construction progressed, Blaze would submit periodic payment requisitions to the Home Program. The Home Program would then review and approve the payment requisitions and submit to HUD draw down requests against the grant funds. HUD would then pay the Home Program who would in turn pay Blaze. By the time Blaze had completed 51 units under the 1992 Contract, the Blackfeet Tribe received from HUD and paid Blaze all but about $15,000 of the grant funds.

### D. *Lodgebuilder Management and Last Star Home Housing Project*

On January 23, 1993, the 92'–94' Tribal Council approved the Tribal Charter of Lodgebuilder as a for-profit tribal corporation. At that time, Mr. Aubrey owned fifty-one percent (51%) of Lodgebuilder, while Brenda Todd and Jim Aubrey respectively owned thirty-nine (39%) and ten percent (10%) of that entity. The purposes of Lodgebuilder included, among other things,

1) to advise, consult and manage construction related activities on the Blackfeet Indian Reservation;

2) to contract for, acquire, superintend, manage, operate, cooperate with, and assist in, the maintenance and operation of business enterprises relating to construction-related activities; and

3) to own, operate, assist, finance, audit, supervise, and otherwise deal with corporations, associations, business, financial and other enterprises in construction-related fields.

In about early 1993, the 92'–94' Tribal Council learned that HUD sought to sell its interest in the so-called Last Star project, which is a 50–home development on the Blackfeet Indian Reservation. On March 4, 1993, the 92'–94' Tribal Council authorized the Blackfeet Tribe to negotiate and purchase the Last Star project from HUD. The 92'–94' Tribal Council also authorized Donald Magee, who replaced Joe McKay as a co-director of the Home Program after McKay resigned in February 1993, and Cynthia Kipp to sign all documents and to coordinate all activities of the proposed Last Star purchase.

On June 3, 1993, the Secretary of HUD and the Blackfeet Tribe executed an Assignment of Interest in Leasehold Estate and in Easements ("Assignment"). According to the Assignment, HUD agreed, subject to certain restrictions contained in Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f, to assign its interest in the Last Star project to the Blackfeet Tribe for twenty (20) years. In consideration for the assignment, the Blackfeet Tribe paid HUD $6,900 and agreed to establish a $100,000 reserve fund for non-routine maintenance and administration.

On March 31, 1993, before HUD assigned its interest in the Last Star Project to the Blackfeet Tribe and in anticipation of that assignment, the Home Program and Lodgebuilder executed a Rental Property Management Contract. According to that contract, Lodgebuilder agreed, *inter alia*, to furnish administration, office, labor, materials, and equipment to operate and maintain the Last Star Project.

On February 7, 1994, the Home Program and Lodgebuilder executed a Property Management Contract, which superseded the March 31, 1993 Rental Property Management Contract ("Management Contract"). According to the Management Contract, Lodgebuilder continued to be responsible for the same duties set forth in the 1993 contract. The only difference was that, in addition to the 50 Last Star homes, Lodgebuilder was also responsible for 50 homes that had been built pursuant to the 1992 Contract. The Management Contract also provided that the Home Program would reimburse Lodgebuilder for "all administrative, utility, maintenance, taxes and insurance expenses incurred during the course of the contract" and that the Home Program would pay Lodgebuilder a separate annual management fee of $18,000. After tenants moved into the newly constructed homes in 1993, Lodgebuilder began to manage those homes together with the Last Star homes. Lodgebuilder's responsibilities under the Management Contract were virtually identical to Blaze's administrative and management duties as set forth in the 1992 Contract.

### E. *1993 Grant Application and 1994 Contract*

In 1993, HUD published a Notice of Funding Availability announcing that addi-

tional funds were available for Indian applicants. As anticipated when the 1992 Grant Application was being processed, the Blackfeet Tribe decided to submit an application for additional grant awards and authorized Blaze to prepare the necessary documentation. On or about April 28,1994, HUD notified the Home Program that HUD had approved three grant awards for fiscal year 1993 funding. The first award, M93–IG910001, was in the amount of $808,884 for the construction of 10 units. The second award, M93–IG910002, was also in the amount of $808,884 for the construction of 10 units. The third award, M93–IG910003, was in the amount of $911,864 for the construction of 12 units. Accordingly, the Home Program had received an additional $2,529,622 in grants for the construction of 32 units.

Shortly after it had received the grant award letters, the Home Program solicited requests for proposals to build 32 dwelling units. Blaze submitted the only bid in response to the request. Blaze's submission provided that Blaze would develop 32 units for a total development (site work, land acquisition, design and front lawns) price of $2,592,622. In addition, Blaze offered to establish a cash reserve account of $600,000. Blaze indicated that the proposal would be implemented by first constructing the first 25 units and then subsequently arranging for mortgage financing on the completed units to pay the cost of building the remaining units. The mortgage financing would also provide the proposed cash reserve of $600,000. Blaze further proposed to provide full management and maintenance under a separate agreement after the units were occupied.

On or about May 16, 1994, the Home Program Board of Directors resolved to accept Blaze's proposal. By that time, the directors and legal existence of the Home Program changed. On March 7, 1994, the Blackfeet Tribe had incorporated the Home Program as a tribally chartered non-profit corporation. According to the Home Program's Articles of Incorporation,

five 92'–94' Council members were appointed to the initial Home Program Board of Directors including Cynthia Kipp (former co-director), Don Magee (former co-director), Al Potts, Marlene Bear–Walter, and George Running Wolf. The number of directors then increased to seven with the appointment of Lee Wilson and Franklin Comes at Night. Some of the first official acts of the newly appointed board were to ratify all the acts and decisions of the former unincorporated Home Program and to accept Blaze's new proposal.

After the Home Program resolved to accept Blaze's proposal, Blaze and the Home Program executed a contract for development, administration, and management services dated May 16, 1994 ("1994 Contract"). The 1994 Contract had been for the construction of 32 units based on the following terms:

Home shall pay the CONTRACTOR $2,529,622, in return for which the CONTRACTOR shall be obligated to construct and administer 25 units. When said units are completed, the CONTRACTOR and HOME shall make a best effort to arrange for and obtain the maximum amount of mortgage financing possible, with HOME as the Borrower, using the 25 units as security for the mortgage. The monies obtained from said mortgage, if obtained, shall be added to the price of this contract and shall be used by the CONTRACTOR to plan, design and construct no fewer than 7 additional housing units and to provide a cash reserve for the mortgage and for use in administration in the amount of $600,000. The parties acknowledge that the completion of these additional 7 units and the establishment of a reserve fund is contingent upon successfully obtaining the mortgage financing described above.

The 1994 Contract also provided for the administration of all units developed for 20 years. The administration provision indi-

cated that "administration shall be merged with" the 1992 Contract.

The 1994 Contract incorporated a budget. The 1994 Contract budget included costs for management, consulting, administration, insurance and a cash reserve. The total budget of $3,745,622 was based on the grant awards of $2,529,622 plus the potential to leverage the 32 homes for $38,000 each for a sum of $1,216,000.

On or about May 16, 1994, National Union, as surety, issued another performance and payment bond ("1994 Bond") on behalf of Blaze, as principal, in favor of the Home Program, as obligee. The 1994 Bond was required by HUD regulation, and was in the amount of the grant awards, $2,529,622. After National Union issued the 1994 Bond, the Home Program issued to Blaze a Notice to Proceed. According to the 1994 Contract, Blaze agreed to complete construction of the first 25 units within 24 months of June 16, 1994. Blaze commenced construction under the 1994 Contract shortly after executing the agreement.

### F. *1994 Tribal Elections and Declaration of Default of the 1992 Contract*

In June 1994, the Blackfeet Tribe held its biannual elections for Council positions. All new members, except Earl Old Person and Marlene Bear–Walter, were elected to serve on the 1994–1996 Council. In addition to Mr. Old Person and Ms. Bear–Walter, Tom Thompson, Gabe Grant, Gene Dubray, Charles Connelly, Francis Williamson, Roger Running Crane, and George Kicking Woman (collectively "94'–96' Council") were elected. After the election, the 94'–96' Council members terminated the co-directors of the Home Program and replaced them with five newly elected Council members. The 94'–96' Tribal Council also directed the Blackfeet Legal Department ("Legal Department") to review the relationships between the Home Program, Blaze, Lodgebuilder, and the Last Star Project.

Thereafter, the Legal Department, by and through Joe Gervais, the tribal economist, requested information from Mr. Aubrey regarding the 1992 Contract, the 1994 Contract, administration and management issues, construction issues and the proposed mortgage loan. Mr. Aubrey responded to each of the Legal Department's requests. The Legal Department then reported Mr. Aubrey's responses to the 94'–96' Council.

On October 24, 1994, the Tribal Council appointed Joe Gervais as interim director and as Contracting Officer of the Home Program. As interim director and contracting officer, Mr. Gervais was responsible for, among other things, the complete administration of the Home Program, for administration of all contracts entered into by the Home Program, and to investigate and audit all aspects of the Home Program.

Also on October 24, 1994, the Blackfeet Tribe requested Blaze to provide an explanation of how Blaze "intends to complete the 21 additional units required under the contract within the contract price." In response, Blaze indicated that it would complete those units and fund the management/maintenance reserve when the Blackfeet Tribe authorized the mortgage financing set forth in the 1992 Contract. After receiving Blaze's response, the Blackfeet Tribe informed Blaze that it was the Tribe's position that the 1992 Contract required Blaze to construct 72 units using only the $5,516,538 grant funds. The Blackfeet Tribe also indicated that it did not agree in the 1992 Contract to obtain mortgage financing for construction of any of the homes and that there was no HUD requirement that mortgage financing be obtained as part of the project. The Blackfeet Tribe then demanded that Blaze complete 21 new units.

On or about November 9, 1994, Joe Gervais, in his capacity as contracting officer, issued to Blaze his decision regarding the Home Program's November 3, 1994, Demand for Completion of Contract. That

Demand had been sent by Gervais in his capacity as interim Home director. In his decision as Contracting Officer, Mr. Gervais stated, in relevant part, that the 1992 Contract required Blaze to complete 72 units for $5,516,538 and that the Blackfeet Tribe did not have to obtain mortgage financing.

Also on November 9, 1994, Mr. Gervais advised the Home Program Board of Directors that it was his position that Blaze was in default of the terms and conditions of the 1992 Contract. The same day Mr. Gervais rendered his decision, the 94'–96' Council decided to accept the decision. The 94'–96' Tribal Council authorized the Home Program to make a demand on National Union under the 1992 Bond. On or about November 14, 1994, the Blackfeet Tribe and the Home Program, by and through their counsel Jeanne S. Whiteing, issued a Notice of Default under the 1992 Contract and notified National Union of the alleged default.

On or about March 20, 1995, the Home Program terminated Blaze/Lodgebuilder's administration and management of the Last Star Project and the Home Program. In its termination letter, the Home Program indicated that the termination includes all management and administrative functions under the 1992 Contract, the 1994 Contract, March 31, 1993 Rental Property Management Contract and the Management Contract. According to the Home Program, the reasons for termination included, among other things, unacceptable conflicts of interest, excessive costs of management, and use of HUD funds for administration and management.

On or about April 11, 1995, the Blackfeet Tribe issued to Blaze a Notice to Resume Construction under the 1992 Contract. By issuing the Notice to Resume construction, the Blackfeet Tribe was taking the position that the March 20, 1995, termination letter did not terminate any construction obligations of Blaze under the 1992 Contract. Mr. Gervais advised Blaze that, in his opinion, the management and administration functions were outside of the 1992 Contract. Also on April 11, 1995, the Home Program requested that Blaze execute Change Order # 2, which proposed, among other things, reducing the number of units to be constructed under the 1992 Contract from 72 to 66.

After the Home Program terminated Blaze's management and administration functions and the Home Program issued its Notice to Resume construction, Blaze submitted a claim to the Home Program in excess of $2.3 million for breach of the 1992 Contract. On May 2, 1995, the Home Program responded to Blaze's claim and stated that Blaze was not entitled to assert a claim because the management duties were terminated for cause.

On or about October 10, 1995, the Blackfeet Tribe issued to Blaze a Notice of Default and Termination of Right to Proceed under the 1992 Contract ("Notice of Default"). The Notice of Default stated, in pertinent part, that it was the Home Program's position that the total contract price under the 1992 Contract was $5,722,-049, and that the Blackfeet Tribe was justified in refusing to enter a mortgage loan agreement. On or about November 2, 1995, Blaze responded to the Notice of Default and denied the findings by the Home Program. In its response, Blaze noted, in relevant part, that the Home Program and the 94'–96' Tribal Council's refusal to fulfill the mortgage requirements under the 1992 Contract resulted in a lack of funding and a unilateral breach of the 1992 Contract.

### G. Declaration of Default under the 1994 Contract

Between the time the 94'–96' Tribal Council took office in July 1994 and the time the Home Program terminated Blaze/Lodgebuilder's management and administration duties under the Management Contract, the 1992 Contract and the 1994 Contract, Blaze continued to construct homes under the 1994 Contract. The

Home Program also continued to approve Blaze's progress payments. However, in or about late 1994 or early 1995, the Home Program sought to change the method in which it had been paying Blaze under the 1994 Contract. Joe Gervais, as interim director, sought to withhold retainage against a progress payment due Blaze equal to a percentage of the progress payments made as of that time. After issuing a check to Blaze for the full amount of the progress payment, the Home Program attempted to stop payment on the check.

In or about March, 1995, Blaze stopped construction under the 1994 Contract and sought assurance from the Home Program that it would be paid. By letter dated April 11, 1995, Ms. Whiteing wrote to Blaze's counsel, Alan Todd, and advised Mr. Todd that the Home Program was willing to pay Blaze on completion of the 25 units provided that Blaze agree to several conditions.

Thereafter, the parties continued to correspond regarding further payments to Blaze under the 1994 Contract. For instance, the Blackfeet Tribe sought to retain a licensed architect to approve Blaze's draw down requests under the 1994 Contract. The Blackfeet Tribe also sought reimbursement for payments received by Blaze from Glacier Electric Cooperative ("Glacier Electric") pursuant to Glacier Electric's Super Good Cents program. That program provided, in pertinent part, that cash payments would be made if homes were built in accordance with energy efficiency standards developed by Glacier Electric. In addition to seeking the Super Good Cents reimbursement, the Blackfeet Tribe sought reimbursement and/or a credit against the contract price for architect and engineering costs, management and consulting, bonds and insurance, TERO fees and mobilization. The Blackfeet Tribe had taken the position that it was entitled to a credit for these items because the 1994 Contract was originally based on the construction of 32 units.

On or about July 16, 1995, Blaze objected to these conditions. Blaze stated that it agreed with the proposal to hire an outside architect to approve draw down requests so long as the architect was acceptable to both parties. Blaze objected, however, to any claim by the Blackfeet Tribe for reimbursement of the Super Good Cents money and the other credits sought by the Tribe. Blaze indicated that the Super Good Cents monies were paid by Glacier Electric to Blaze pursuant to an agreement between Blaze and Glacier Electric and therefore the Blackfeet Tribe was not entitled to payment. As to the other items of claimed reimbursement, Blaze stated that those costs were incurred by Blaze at the beginning of the project regardless of whether 25 or 32 units were built.

On August 28, 1995, Blaze and the Home Program/Blackfeet Tribe apparently agreed to put the reimbursement issues aside. The Home Program and Blaze agreed on an impartial architect to approve progress payments. Blaze submitted a proposed change order to the Home Program for the 1994 Contract. On or about September 27, 1995, the Home Program, by and through Ms. Whiteing, objected to the proposed change order because the Home Program had taken the position that Blaze was responsible for complete hook-up of water lines. Blaze responded by noting that the plans and specifications for the College Place sites, and therefore, the 1994 Contract, only required Blaze to run water lines within the boundaries of the project. Thereafter, Blaze and the Home Program continued to disagree regarding, among other things, whether the 1994 Contract required Blaze to run a water main outside the boundaries of the College Place site.

On February 5, 1996, the Home Program issued a Notice of Default and Termination of Right to Proceed ("Notice of Default II") to Blaze, wherein the Home Program terminated Blaze's right to proceed on the 1994 Contract. In its Notice of Default II, the Home Program found,

among other things, that Blaze "unilaterally and without cause stopped construction on the 25 units on approximately March 21, 1995, and has not resumed construction since that time." By letter dated February 6, 1996, the Home Program, by and through attorney Whiteing, notified National Union that it had issued the Notice of Default II.

On or about February 15, 1996, Blaze responded to and submitted a claim as a result of the Notice of Default II. In its response, Blaze stated, in pertinent part, that the Home Program breached the 1994 Contract by terminating the administration and management portions on March 20, 1995. Blaze further noted that, as a result of that breach, Blaze had requested adequate assurances from the Home Program that the Home Program would pay Blaze for the work Blaze performed. According to Blaze, assurances had not been forthcoming because each time an agreed payment procedure had been discussed, the Blackfeet Tribe imposed other conditions and attempted to change the requirements of the 1994 Contract. Blaze sought damages from the Home Program for improperly issuing the Notice of Default II in the sum of $1,845,392.05.

## H. *Investigation by National Union and Election of New Council*

After National Union received the first Notice of Default, it began to investigate the Home Program's claims. Prior to January 1995, James W. Kisner, a senior bond claim examiner, had been principally responsible for the Home Program's claim under the 1992 Bond. Between January 1995 and April 1996, Anthony Slimowicz, a former National Union claim representative, had been responsible for handling the Home Program's claims. During that period, Mr. Slimowicz met with representa-

tives of Blaze, the Home Program, the Blackfeet Tribe and HUD in an effort to investigate the nature of the Home Program's claims and to resolve the differences between the parties.

Thereafter, in June 1996, a new tribal Council was elected. The only returning members of the 94'–96 Tribal Council had been Messrs. Old Person, Grant, and Williamson and Ms. Bear–Walter. Five new members were elected. At some point after the election, the newly elected council voted to replace Ms. Whiteing and Mr. McKay as tribal counsel with plaintiffs' current counsel.

### I. *Claims Alleged in the Complaint*

In their Third Amended Complaint, plaintiffs allege 19 separate counts against Blaze, Lodgebuilder and/or National Union. In their Prayer for Relief in the Third Amended Complaint, plaintiffs seek judgment together with treble damages, interest, costs and reasonable attorneys' fees against defendants.

## DISCUSSION

### A. *National Union's Motion for Summary Judgment*[3]

 As noted National Union, as surety, issued performance and payment bonds on behalf of Blaze, as principal, in favor of the Home Program, as obligee, in the amount of the grant awards HUD made to plaintiffs. In moving for summary judgment, National Union notes the general rule that sureties have all the defenses that a principal may assert to avoid performance on a bond. *See Asociacion De Azucareros De Guatemala v. United States Nat. Bank of Oregon,* 423 F.2d 638, 641 (9th Cir.1970). When the obligation of a principal is extinguished or released, the surety's obligation ceases. *Id.; see also* 74

**3.** Blaze and Lodgebuilder have adopted National Union's summary judgment arguments in their entirety in support of their own motion for summary judgment, except that they do not agree that plaintiffs overpaid Blaze. Thus, to the extent plaintiffs' claims against

Blaze and Lodgebuilder are the same as plaintiffs' claims against National Union, the following discussion and decisions, except where otherwise noted, apply with equal force to all defendants.

1134

Am.Jur.2d Suretyship § 98 (1974). In this regard, "discharge of the surety can ... occur in those instances in which the obligee so materially and substantially breaches its obligations on the underlying bonded contract that the principal is discharged." Edward G. Gallagher, The Law of Suretyship, Chapter 12 at 12–1 (1993). Relying on these general rules, National Union argues plaintiffs' claims against it may be summarily dismissed for four reasons.

First, plaintiffs materially breached the 1992 Contract with Blaze by failing to obtain mortgage financing. Second, and in the alternative, National Union argues that even if plaintiffs were not required to mortgage the homes, plaintiffs overpaid Blaze under the contract, thus increasing National Union's exposure, as surety, to risk if Blaze failed to perform. These overpayments, National Union argues, discharge it from its payment and performance bond obligations and entitles it to summary judgment. Third, plaintiffs breached the 1994 Contract with Blaze by failing to provide adequate assurances for payment under the contract. Fourth, plaintiffs cannot establish an independent duty, separate from Blaze's contractual duties, that would support any cause of action against National Union sounding in tort.

As might be expected, plaintiffs argue genuine issues of material fact exist as to each argument advanced by National Union, thus precluding summary judgment.

### 1. *Plaintiffs' Claims Predicated Upon the 1992 Contract*

#### a. *National Union's Mortgage Financing Argument*

National Union argues the 1992 Contract, which required Blaze to construct 72 homes, manage the homes for 20 years and establish a $1.3 million reserve fund, provided for financing from a combination of HUD grants and mortgage proceeds. The agreement, National Union argues, called for Blaze to build about 51 homes using

the HUD grants. These homes were to be mortgaged to provide additional money to construct the rest of the 72 homes, fund the $1.3 million reserve and pay for management of the homes for 20 years. By failing to secure the requisite mortgage financing, National Union argues, plaintiffs materially breached the 1992 Contract. National Union argues that the contract's terms, as well as the parties' conduct both prior to and after executing the 1992 Contract, evidence conclusively that mortgage financing was an integral part of the agreement and that plaintiffs' failure to secure it was a material breach.

Plaintiffs, on the other hand, argue the 1992 Contract did not require mortgage financing for the construction of the 72 homes. While they concede that mortgage financing was part of the agreement, plaintiffs argue the 1992 Contract required Blaze to construct all 72 homes using the HUD grant funds. Those homes would then be mortgaged for $38,000 each to individual tenants with the mortgage proceeds retained by plaintiffs for the reserve fund and additional construction over and above the homes funded by HUD.

Generally, the construction and interpretation of contracts raise questions of law for the court to decide. *Klawitter v. Dettmann*, 268 Mont. 275, 886 P.2d 416, 420 (1994). Similarly, whether an ambiguity exists in a contract is a question of law. *Id., citing Audit Services, Inc. v. Systad*, 252 Mont. 62, 826 P.2d 549, 551 (1992).

The intent of parties to a contract is evaluated only when the agreement is not clear on its face. *Id., citing Bain v. Williams*, 245 Mont. 228, 800 P.2d 693, 695 (1990). Where the language of a written contract is clear and unambiguous, it is the duty of the court simply to apply the language of that contract as written to the facts of the case. *See* Mont.Code Ann. § 28–2–905; *see also Nordlund v. School Dist. No. 14*, 227 Mont. 402, 738 P.2d 1299, 1301 (1987); *Maxwell v. Sisters of Charity of Providence*, 645 F.Supp. 937 (D.Mont.

1986). Consequently, absent ambiguity, or one of the other recognized exceptions to the plain meaning rule, a trial court may not receive extrinsic evidence to aid in the interpretation of a written contract. *See Danielson v. Danielson*, 172 Mont. 55, 560 P.2d 893, 894 (1977). In that regard, the court notes "ambiguity does not exist just because a claimant says so. It can only exist where the wording or phraseology of a contract is reasonably subject to two different interpretations." *Holmstrom v. Mutual Benefit Health & Accident Ass'n*, 139 Mont. 426, 364 P.2d 1065, 1066 (1961).

■ Where a contract is ambiguous, obscure or uncertain of meaning, however, extrinsic evidence may be received to resolve the ambiguity and to determine the parties' true intent. *See Monte Vista Co. v. Anaconda Co.*, 231 Mont. 522, 755 P.2d 1358 (1988); *Haggerty v. Gallatin County*, 221 Mont. 109, 717 P.2d 550 (1986). In such a situation, resolution of the ambiguity based upon the evidence presented is properly left to the trier of fact. Mont. Code Ann. § 28–3–301 (1999); *Klawitter*, 886 P.2d at 420; *Gray v. City of Billings*, 213 Mont. 6, 689 P.2d 268, 270 (1984); *Schell v. Peters*, 147 Mont. 21, 410 P.2d 152, 155 (1966).

In the instant case, the Innovative Proposal, Form of Contract and Development Contract comprise the documents that governed the agreement between plaintiffs and Blaze. The Form of Contract and Development Contract both provide, in pertinent part:

> The Contractor [Blaze] shall furnish all labor, material, equipment and services, and perform and complete all work required for the construction of 72 housing units located on the Blackfeet Indian Reservation, Montana. . . .
> \*\*\*

> The HOME [plaintiffs] shall pay the Contractor for the performance of the Contract, in current funds, subject to additions and deductions as provided in the Specifications, in the sum of Five Million Five Hundred Sixteen Thousand Five Hundred Thirty–Eight Dollars, ($5,516,538.00).
> \*\*\*

> The Contract documents shall consist of the following component parts:
> 1. Contract Attachments A and B
> 2. Addenda
> 3. This Instrument
> \*\*\*

Contract Attachment A referred to a two-page document that states, in pertinent part:

> Items of work not included in the Plans & Specifications or the Form of Contract[:]

> Blaze Construction, Inc. will provide:
> 1. Tenant selection and criteria for same.
> 2. Color and model selection and criteria for same.
> 3. Contract between "HOME" and individual tenants.
> 4. Tenant home ownership and responsibility training.
> 5. Private mortgage financing for all tenants.
> 6. Provide a $1,300,000 minimum cash savings account in the name of Blackfeet Tribe Home for the purpose of mortgage insurance, 20 year management and maintenance, or for additional new housing units.
> \*\*\*

Contract Attachment B was purportedly a Home Program Budget.[4] The Addenda to the Contract was Blaze's Innovative

---

4. The version of this document provided by National Union lists the total budget at $8,295,866. *See* National Union's Exhibit 27. The version of this document provided by plaintiffs lists the total budget at $5,516,538. *See* Plaintiffs' Exhibit EE. Also, plaintiffs note that Joe McKay, in his deposition, testified that Attachment B was not attached to any contract he signed. The court is unable to determine from the current record which version of the budget, if either, is correct.

Proposal, which provides, in pertinent part:

> We propose a complete management turnkey concept for the Tribe. Blaze Construction and its consultants will design, construct, manage, counsel tenants, monitor tenant payments and tenant property upkeep, financing, closing and all other mortgage requirements, audits, accounting and turnover to tenants for a cost of $87,000.00 per unit.
>
> At completion of the 72–unit project, with tribal support (no cash or financial), we will provide the following:
>
> 1. Provide, obtain and manage all other (non-government) monies or contributions required for additional units beyond the 63 homes funded by this HUD home grant. These monies will provide added homes, future administration monies as well as those funds in item 4.
>
> 2. 72 families who will own their own home free and clear after 20 years.
>
> 3. Tenant financial assistance in acquiring section 8 vouchers or other family assistance required for monthly home payments.
>
> 4. Provide a *minimum* savings account balance in the Blackfeet Tribe 'HOME' bank account of *$1,300,-000.00. one million three hundred dollars.* [sic] This amount is to guarantee 19 years of additional maintenance, management, mortgage insurance and contribution in the next or continuing 'HOME' program.
>
> \*\*\*
>
> 10. In simple terms, for the complete sum of the grant, we will provide: ($5,516,538.00).
>
> All Management, 20 years.
>
> $1,300,000.00 plus cash in Tribal bank account.
>
> 20 years maintenance for those families deemed incapable of such.
>
> Financial assistance to those whose income is insufficient to satisfy monthly home payment.

> Immediate Blackfeet employment!
>
> \*\*\*

■ In this court's opinion, the language of these poorly drafted contract documents, taken as a whole, is reasonably subject to more than one interpretation and is, therefore, ambiguous. *Holmstrom v. Mutual Benefit Health & Accident Ass'n,* 139 Mont. 426, 364 P.2d 1065, 1066 (1961). Moreover, the language is obscure and uncertain of meaning, leaving to the trier of fact the task of determining the parties' real intent. *Klawitter,* 886 P.2d at 420–21. While the language of these documents may permit an inference consistent with National Union's interpretation of the contract, it may also reasonably permit an inference that supports plaintiffs' interpretation of the contract.

Both parties have submitted extrinsic evidence, in the form of documents and deposition testimony, to show their real intent and to support their respective interpretations of the language of the contract. As noted *supra,* however, consideration of evidence presented, for resolution of the contract's ambiguity and for determination of the parties' intent, is the task of the trier of fact. *Gray,* 689 P.2d at 270; *Schell,* 410 P.2d at 155. In sum, genuine issues of material fact exist regarding whether Blaze was to construct all 72 homes for the amount of the HUD grants, or whether the construction and management of the homes were to be funded by a combination of HUD grant funds and mortgage proceeds from a portion of the 72 homes. Thus, National Union's motion for summary judgment is denied to the extent it is predicated upon its mortgage financing argument.

#### b. *National Union's Overpayment Argument.*

■ Also with regard to the 1992 Contract, National Union argues that even if plaintiffs were not required to mortgage the homes in the manner alleged, National Union's obligations under the 1992 bond

are discharged if plaintiffs overpaid Blaze for unearned work under the 1992 Contract. National Union argues that by the time Blaze had completed 51 homes under the 1992 Contract, plaintiffs had received from HUD and paid Blaze all but about $15,000.00 of the grant funds. With only $15,000.00 in grant funds remaining and plaintiffs expecting Blaze to build 21 more homes, National Union argues, it is clear plaintiffs improperly overpaid Blaze. These improper overpayments, National Union argues, both reduced National Union's security (as surety) that plaintiffs (as obligees) agreed to hold for its benefit, and reduced Blaze's (as principal and contractor) incentive to finish the work according to the contract.

Plaintiffs argue that if they made any overpayments to Blaze, the overpayments resulted from misrepresentations Blaze made to them about the progress of the work and the amounts to which Blaze was entitled. In this regard, plaintiffs argue they made all payments to Blaze in good faith under the belief that the payments were warranted. Moreover, plaintiffs maintain that Blaze used part of the payments to purchase materials for completion of the 1992 Contract and that the amount of those payments must be considered in determining whether any overpayments were made to which Blaze was not entitled. Finally, plaintiffs argue that exoneration of National Union under the 1992 bond, if appropriate, is allowed only to the extent of any overpayments made, not for all of National Union's obligations under the bond.

Under Montana law, a surety is exonerated from its obligations under a bond, *inter alia,*

> to the extent to which he is prejudiced by any act of the creditor which would naturally prove injurious to the remedies of the surety or inconsistent with his rights or which lessens his security
> ...

Mont.Code Ann. § 28–11–412 (1999).

One way in which a surety may be injured, or have less security, and thus assert a defense to performance of its obligations under a bond, is if the obligee materially alters the terms of a construction contract by overpaying the principal. *See, e.g., Southwood Builders Inc. v. Peerless Ins. Co.,* 235 Va. 164, 366 S.E.2d 104, 108 (1988); *Airtrol Engineering Co. v. United States Fidelity & Guaranty Co.,* 345 So.2d 1271, 1273 (La.App.1977). Again, this defense is available only to the extent to which the surety is prejudiced. Mont.Code Ann. § 28–11–412.

The rationale for this defense comes from the understanding that when the bond was executed, the surety agreed to be bound only to the risks extant in the construction contract between the principal and obligee at the time of execution. If the principal and obligee alter the contract, the surety may be exposed to risks not contemplated at the time the bond was executed. *See Inland Nav. Co. v. American Surety Co.,* 190 Ky. 504, 227 S.W. 809 (1921). Put another way, improper overpayment may harm the surety's ability to seek subrogation in the contract balance as security for the expense of completion of the contract, and also may diminish the principal's incentive to complete the work. *See United States v. Continental Cas. Co.,* 512 F.2d 475, 478 (5th Cir.1975).

Courts have held that the overpayment defense does not apply, however, in cases in which the obligee has, with due care and in good faith, made payments under the contract in reliance upon the principal's representation of performance. *See, e.g., Transamerica Ins. Co. v. City of Kennewick,* 785 F.2d 660, 661 (9th Cir.1986) (citing Washington cases); *Town of East Longmeadow v. Maryland Cas. Co.,* 348 Mass. 722, 206 N.E.2d 54, 58 (1965). Nevertheless, the defense still applies if the obligee was negligent in making overpayments to the principal. *See Transamerica Ins. Co. v. City of Kennewick,* 785 F.2d at 662 (applying Washington law and holding that an obligee was not entitled to a good

faith defense because it relied on the certifications of its own employees when making improper payment, and thus acted negligently).

■ In the instant case, in this court's opinion, the current record demonstrates plaintiffs improperly overpaid Blaze and acted without due care to National Union's security as surety in doing so. Consequently, plaintiffs acted negligently and cannot assert a good faith defense for their overpayments.

As the record reflects, both the tribal inspector, Bill Salois, and the HOME program's co-director at the time, Cynthia Kipp, who was also a '92–'94 tribal council member, testified regarding the payment procedure employed when Blaze sought payment for work completed. As Mr. Salois testified:

Q: Bill, during the course of your job duties as tribal inspector, were you involved with the tribal requisition process? Blaze would submit payment requisitions to be paid?

A: I would have to inspect the work that was done and sign for it in order for him to be paid.

This testimony makes clear that plaintiffs' own employee inspected Blaze's work and approved the work with his signature before Blaze could receive any payment. Moreover, Ms. Kipp's testimony provides:

Q: Okay. Now, as the codirector of the HOME Program, you had to authorize payments?

A: Yes.

Q: And could you tell me what procedure was followed before you could authorize a payment on the contracts?

A: To see that work was completed.

Q. And what would you personally do?

A. From the beginning, from the very beginning or what?

Q. What I'd like you to do is kind of run me through the process that was used. Did you go, did you go out and look at the houses? Were you presented with paperwork? Just kind of tell me the process that was in place.

A. At the beginning of the project, I was there, personally took pictures of everything from beginning to completion, and that's everything. I documented the pictures of them surveying the land, of the foundations, to see, make specifically sure that rebar was in the concrete, when the water was snubbed in, when the floor was, floors were put on, and the 2 by 6's, the only homes on the Blackfeet Reservation that were built with 2 by 6's because of our wind, the velocity of our wind, and the insulation, the windows, the trusses, everything, and I have it all documented in pictures.

\* \* \*

Q. (By Ms. Reinhardt) Okay, so you were on the construction site pretty regularly, it sounds like?

A. Practically. I had other duties as well, though, you know, I was doing other things, but I made it a point to go and see.

Q. Okay.

A. Because those were my duties as Buildings and Utilities Chairperson.

Q. Okay. Now, when it came time for Blaze to get a payment on the contract, to draw down money from the HUD funds, what process was in place?

A. What process to pay them?

Q. Yes.

A. They had to have, you know, items, an itemized list, we had to look at the itemized list, you had to see if this specific increment, what I'm telling you about, was specifically done, then they were paid.

Q. So they brought you some documentation that you reviewed?

A. Yes.

Q. Okay. And then are you telling me that you independently went out to make sure that the work that was listed on the request for payment had been completed?

A. I was probably on the job site during and before, after completion of each increment of building, what it entails to build a home.

Q. Did you go out to the job site each and every time you were presented with a request for payment?

A. No, I just told you I probably was there before and during and after before a payment was presented, so that I knew that that was completed—

Q. Okay.

A.—before they were paid. Do you fully understand that?

Ms. Kipp's uncontroverted testimony demonstrates plaintiffs visually monitored the work progress and, in fact, documented the work with photographs. Plaintiffs did not merely rely upon Blaze's representations in documents to account for work done, or materials purchased, for which Blaze requested payments.

The uncontroverted testimony of Mr. Salois and Ms. Kipp shows that Blaze was paid only after plaintiffs inspected the work. Any improper payments to Blaze for work done or materials purchased, therefore, were made negligently by plaintiffs. *Transamerica Ins. Co. v. City of Kennewick,* 785 F.2d at 662. Thus, plaintiffs' good faith defense is inapplicable.

Moreover, plaintiffs have presented no evidence that Blaze made any material misrepresentations regarding the amount of work performed, or materials purchased, for which it was seeking payments.

Indeed, plaintiffs' argument that Blaze made misrepresentations in this regard has even less validity given the apparent vigilance with which plaintiffs monitored Blaze's work progress and the accountability procedure it employed to verify Blaze's payment requests.

For these reasons, the court deems it appropriate to grant National Union's motion for summary judgment to the extent it seeks a ruling, as a matter of law, that plaintiffs overpaid Blaze.[5] The next question, then, is the extent of exoneration to which National Union is entitled on its 1992 bond obligations. As noted above, a surety in Montana is entitled to exoneration of performance of its bond obligations only to the extent to which the surety is prejudiced. Mont.Code Ann. § 28-11-412. On the current record, the court is unable to determine the extent to which National Union was prejudiced by plaintiffs' overpayments to Blaze. Therefore, the court reserves its ruling on this issue until the presentation of evidence on the issue at trial.

### 2. *Plaintiffs' Claims Predicated Upon the 1994 Contract.*

National Union argues plaintiffs committed an anticipatory breach of the 1994 Contract by failing to provide Blaze with adequate assurances of payment when requested by Blaze. In March of 1995, plaintiffs terminated management and administrative functions under the contract and tried to withhold payments due to Blaze. Blaze then sought plaintiffs' assurance that they would continue payments to Blaze for constructing homes under the contract. Instead of providing assurances of payment, National Union argues, plaintiffs' response to Blaze's request was to condition payment on completion of terms

5. For purposes of this ruling only, the court has taken as true plaintiffs' position that Blaze was required to build all 72 homes for the amount of the HUD grants without mortgage proceeds. Thus, even if plaintiffs prevail at trial on that position, the instant ruling on the overpayments issue likely will reduce the amount plaintiffs may recover on their claims predicated on the 1992 Contract. On the other hand, should defendants prevail on the issue, the instant determination likely will be rendered moot.

neither contained in nor contemplated by the 1994 Contract. Blaze construed plaintiffs' actions as an anticipatory breach and, because it feared plaintiffs would not make required payments for continued work on the homes, National Union argues, Blaze stopped construction under the 1994 Contract. Plaintiffs' anticipatory breach, National Union argues, relieves National Union of its obligations as surety under the 1994 Contract and bond.

Plaintiffs concede they placed conditions on payments explaining that they did so because they believed Blaze and Lodgebuilder were in default on their management and administrative functions under the 1994 Contract. Specifically, plaintiffs argue that they requested from Blaze and Lodgebuilder that they comply with certain procedures designed to bring accountability to the HOME Program. When Lodgebuilder failed to follow the conditions imposed, plaintiffs terminated their management and administrative functions. Because they were justified in terminating these functions, plaintiffs argue, they did not breach the 1994 Contract. Moreover, plaintiffs argue, even if they did breach the contract, Blaze did not have the right to cease construction because the administrative and management functions were clearly divisible from the construction terms in the contract.[6]

 In Montana, if reasonable grounds exist to believe that a party to a contract will breach by non-performance, the other party may demand adequate assurance of performance and suspend his own performance on the contract, if reasonable, until adequate assurance is received. *Julian v. Montana State Univ.*, 229 Mont. 362, 747 P.2d 196, 199 (1987), *citing*, RESTATEMENT (SECOND) OF CONTRACTS § 251 (1979). The rule's purpose is to give a party recourse in the event the other party to a contract indicates he will not perform, but his ac-

tions do not yet rise to a level of anticipatory repudiation. *Id.* at 199–200.

 In the instant case, in this court's opinion, it was reasonable for Blaze to suspect that plaintiffs would breach the 1994 Contract by suspending payments. It is undisputed plaintiffs attempted to withhold certain payments due under the contract and also terminated Blaze's administration and management functions provided for in the contract. Thus, it was reasonable for Blaze to seek adequate assurance from plaintiffs that they would continue to pay Blaze before Blaze resumed construction of homes under the 1994 Contract. The next question, then, is whether plaintiffs adequately assured future payments when asked to do so, or whether, as National Union argues, plaintiffs committed an anticipatory breach by failing to provide adequate assurance.

 A party commits an anticipatory breach of contract in Montana when he repudiates his contractual duty prior to the time fixed for performance. *Chamberlin v. Puckett Constr.*, 277 Mont. 198, 921 P.2d 1237, 1239 (1996), *citing, STC, Inc. v. City of Billings*, 168 Mont. 364, 543 P.2d 374, 377 (1975). "A repudiation must be entire, absolute and unequivocal to support an action for anticipatory breach. An expression of intent not to perform, standing alone, is not enough." *Chamberlin*, 921 P.2d at 1239. Moreover, a party does not commit an anticipatory breach if he offers to perform in accordance with his erroneous interpretation of his contractual rights. *Id., citing, United California Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 681 P.2d 390, 431 (App.1983). This is not an anticipatory breach because, although the party may be incorrect in his interpretation of the contract, he is still offering to fulfill his own duties under the contract and is not stating an intent not to perform. *Chamberlin*, 921 P.2d at 1240. For there to be an anticipatory breach, the party's insis-

---

**6.** Plaintiffs appear to have misunderstood National Union's argument. National Union has argued that plaintiffs' anticipatory breach

arose from their failure to provide adequate assurance of payments to Blaze under the contract.

tence on compliance with terms not in the contract must be accompanied by a "clear manifestation of intention not to perform" unless the additional condition is met. *Id., citing, United California Bank,* 681 P.2d at 430–31.

■ In the case at hand, the court believes genuine issues of material fact exist that preclude summary judgment on National Union's argument that plaintiffs committed an anticipatory breach by failing to provide adequate assurance of continued payments under the 1994 Contract. It is true, as National Union has noted, that on April 11, 1995, plaintiffs' counsel at the time sent Blaze's counsel at the time a letter that states plaintiffs would pay Blaze under the 1994 Contract upon completion of the 25 units, provided that Blaze complied with about six conditions listed in the letter. It is also true, however, that in a letter dated July 14, 1995, plaintiffs' counsel wrote, in what was apparently one installment in a series of correspondence between the parties, the following:

> ... I also requested "clarification" of funds drawn down by Blaze for architect and engineering, management and consulting, bonds and insurance, TERO fees and mobilization. These funds were drawn down by Blaze based on the budget for 32 homes; however, only 25 homes are being built under the contract. My letter did not state, imply or otherwise indicate in any manner that the HOME program does not intend to pay the full contract amount to Blaze. However, it is clear that Blaze drew down funds for the above items for the full 32 units. Therefore, some modification or adjustment must be made in future draw down requests which credits the HOME Program for these premature draw downs. The HOME Program *does* intend to pay the full contract amount as stated in at least two prior letters to you.

Because of this conflicting evidence, the court is not able to rule as a matter of law that plaintiffs' repudiation of its obligation to pay Blaze under the 1994 Contract was entire, absolute and unequivocal. Therefore, National Union's motion for summary judgment on this issue is appropriately denied.

### 3. *Plaintiffs' Tort Claims.*

National Union argues plaintiffs' tort claims may be summarily dismissed because plaintiffs cannot identify any set of facts giving rise to an independent duty, separate from the contractual duties of Blaze or National Union, that would support a cause of action against National Union sounding in tort.

Plaintiffs argue their tort claims are viable because Montana law permits tort and contract actions on the same set of facts. Plaintiffs concede they are not entitled to double recovery, but are permitted to pursue both contract and tort claims and then elect their remedy at the conclusion of the case.

Plaintiffs' three tort claims against National Union allege negligence for: Blaze's breach of duty to perform the 1992 Contract in a workmanlike manner according to standard practices (Count Three); Blaze's and Lodgebuilder's breach of duty to manage the HOME units and Last Star Project in accordance with good management practices and the standard of the industry (Count Eight); and, Blaze's breach of duty to design the plans and specifications for the 1992 and 1994 Contracts in accordance with the Tribal Code, and breach of duty to prepare the final drawings prior to construction (Count Ten). Plaintiffs argue that the terms of the bond issued by National Union make National Union liable for its principals' breach of duties.

■ In Montana, before a party can recover for a tort or for a breach of contract on the same set of facts, there must exist an independent duty, separate and distinct from the obligations imposed by the contract. *Boise Cascade Corp. v. First Sec. Bank of Anaconda,* 183 Mont. 378,

600 P.2d 173, 182 (1979), *citing, First Sec. Bank of Bozeman v. Bankers Union Life Ins. Co.,* 181 Mont. 407, 593 P.2d 1040, 1047 (1979). In other words, "a tort arises out of a breach of contract if the party also breaches a duty he owes which he owes to another independently of the contract, and which duty would exist even if no contract existed." *First Sec. Bank of Bozeman,* 593 P.2d at 1047. Whether a legal duty is owed from one party to another is a question of law. *Thomas v. Northwestern Nat'l Ins. Co.,* 292 Mont. 357, 973 P.2d 804, 807 (1998).

A review of the pleadings and evidence of record convinces this court that plaintiffs' tort claims against National Union depend upon the same set of facts upon which plaintiffs rely in pursuing their contract claims. The question, then, is whether any of the defendants owed plaintiffs an independent duty, separate and distinct from their contractual obligations, that would give rise to the tort causes of action.

In Montana, there is implied into every contract the covenant of good faith and fair dealing. *See Story v. City of Bozeman,* 242 Mont. 436, 791 P.2d 767, 775 (1990). Breach of the covenant is a breach of the contract, and only contract damages are available. *Id.* Montana law also recognizes the tort of bad faith, although "the tort can only be pursued in a contractual setting where 'special circumstances' exist between the parties and the matter is not otherwise controlled by specific statutory provisions." *Thomas,* 973 P.2d at 810. A breach of the duty to act in good faith sounds in tort. *Stephens v. Safeco Ins. Co. of America,* 258 Mont. 142, 852 P.2d 565, 567–68 (1993).

In determining whether parties to a contract have a special relationship and thus, whether a duty exists that might give rise to a tort cause of action, courts review five elements:

> (1) the contract must be such that the parties are in inherently unequal bargaining positions; [and] (2) the motivation for entering the contract must be a non-profit motivation, i.e., to secure peace of mind, security, future protection; [and] (3) ordinary contract damages are not adequate because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior party "whole"; [and] (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and (5) the other party is aware of this vulnerability.

*Story,* 791 P.2d at 776.

Application of these factors to the instant case reveals plaintiffs are unable to satisfy, at a minimum, the first and third *Story* elements. Plaintiffs have presented no evidence that they are in an inherently unequal bargaining position with National Union. On the contrary, it is indisputable that the Blackfeet Tribe is a sovereign entity self-governed by a council of elected officials. It had, and has, legal counsel to assist in all aspects of governance, including business transactions in which it may engage. Plaintiffs are far from being a typical "consumer" who may find himself or herself in an unequal bargaining position with an insurer or other corporate entity with which he or she seeks to do business. Moreover, and probably more significantly, plaintiffs have failed to show how ordinary contract damages are not adequate. Thus, in this court's opinion, the parties did not have a special relationship, and National Union owed no duty to plaintiffs separate and distinct from those in the various contracts that would support tort claims against it. Consequently, National Union's motion for summary judgment is appropriately granted to the extent it seeks dismissal of Counts Three, Eight and Ten of plaintiffs' Third Amended Complaint.

**B. *Blaze and Lodgebuilder's Motion***

*for Summary Judgment*[7]

### 1. The Super Good Cents Program Claim

██ Glacier Electric Cooperative administers the Super Good Cents Program for the Bonneville Power Administration. The program seeks to encourage construction of energy efficient homes by paying incentive funds to program participants. In Count Five of their Third Amended Complaint, plaintiffs, claiming entitlement to the incentive funds paid for the homes built pursuant to the 1992 Contract, allege Blaze and Lodgebuilder converted the funds.

Blaze and Lodgebuilder argue plaintiffs' claim in this regard should be summarily dismissed for two reasons. First, they argue that the Super Good Cents Program requirements were not included in the specifications of the 1992 Contract. Second, they argue that nothing in the 1992 Contract, the 1994 Contract or their contract with Glacier Electric Cooperative provides that plaintiffs were entitled to the funds.

Plaintiffs, on the other hand, argue genuine issues of material fact exist regarding ownership of, or entitlement to, the funds. They argue the contract terms that reference energy efficiency were drafted in such a way that any contractor bidding on the project would include in its bid the costs of complying with the Super Good Cents Program. Thus, they argue, the program was part of the specifications for the project.

The parties agree that the specifications for the project contain two references that relate to energy efficiency. The first is under Section 22 of the "INDIAN HOUSING SPECIAL CONDITIONS OF CON-VENTIONAL BID CONSTRUCTION CONTRACT," which provides:

> The Contractor and his subcontractors shall comply with mandatory standards and policies relating to energy efficiency which are contained in the state energy conservation plan issued in compliance with the Energy Policy and Conservation Act (Pub.L.94-163).

The second reference to energy efficiency in the specifications is in Section 07200-1 under the section entitled "THERMAL AND MOISTURE PROTECTION," which provides:

> INSULATION:
> *All work* to be in accordance with local governing utility specifications for "Long term-Super Good Cents".

After reviewing the documents of record, the court concludes that references to the Super Good Cents Program, taken as a whole, are ambiguous. *Holmstrom,* 364 P.2d at 1066. Thus, summary judgment is inappropriate on the question of which party is entitled to the incentive funds. Consequently, the motion of Blaze and Lodgebuilder for summary judgment is appropriately denied as it relates to this claim.

### 2. Conversion Claim

██ In Count Thirteen of their Third Amended Complaint, plaintiffs allege conversion of HOME funds in the following instances: (1) Blaze and/or Lodgebuilder built homes on the individual trust land of Don Wilson, a Blackfeet Tribal member, and on land held in trust for Pearl Matt, also a Blackfeet Tribal member, without obtaining the consent of the Blackfeet Tribe or HOME Program regarding the transactions involved and without paying funds received as a result of the transac-

---

7. It should be noted from the outset that the court, in an abundance of caution, is not inclined at this juncture to apply the reasoning and analysis employed in section A.3., *supra,* relative to the dismissal of plaintiffs' tort claims against National Union, to adjudication of plaintiffs' tort claims against Blaze and Lodgebuilder. Even though Blaze and Lodgebuilder adopted by reference all of National Union's summary judgment arguments, the parties neither raised nor discussed the issues discussed in section A.3. as they may relate to the potential tort liability of Blaze and Lodgebuilder.

tions to the Blackfeet Tribe or HOME Program; (2) Blaze and/or Lodgebuilder acquired a Chrysler truck, two garbage trucks and a snow plow[8] without titling them, or transferring possession of them, to the Blackfeet Tribe or the HOME Program.

Having reviewed the record, the court concludes genuine issues of material fact exist precluding summary judgment regarding plaintiffs' conversion claim in Count Thirteen. Therefore, the motion of Blaze and Lodgebuilder for summary judgment is appropriately denied as it relates to this claim.

### 3. *The Misrepresentation Claims*

In Counts Fourteen and Fifteen of their Third Amended Complaint, plaintiffs allege Blaze and/or Lodgebuilder fraudulently and negligently misrepresented facts and circumstances related to the construction, administration and management of the HOME Program homes. Blaze and Lodgebuilder predicate their motion for summary judgment regarding these two claims solely on their position that HUD grant funds were not to be the sole source of construction funding, but rather mortgage proceeds also were to be used to complete the project.

The court has previously determined that genuine issues of material fact exist regarding the source or sources of funds that were to be used to complete the project. *See supra* section A.1.a. Therefore, the motion of Blaze and Lodgebuilder for summary judgment is appropriately denied as it relates to these claims for the reasons already stated.

### 4. *The Bad Faith Claim*

In Count Sixteen of their Third Amended Complaint, plaintiffs allege Blaze and Lodgebuilder breached the implied covenant of good faith and fair dealing extant

in their contracts with plaintiffs. Again, Blaze and Lodgebuilder predicate their motion regarding this claim solely on their position that HUD grant funds were not to be the sole source of construction funding, but rather mortgage proceeds also were to be used to complete the project.

As already noted, *see* section A.1.a., genuine issues of material fact exist regarding the source or sources of funds that were to be used to complete the project. Consequently, the motion of Blaze and Lodgebuilder for summary judgment is appropriately denied as it relates to this claim for the reasons already stated.

### 5. *Presentation of a False Payment Voucher Claim*

 In Count Seventeen of their Third Amended Complaint, plaintiffs allege Blaze and Lodgebuilder violated 25 U.S.C. § 88 by submitting false payment vouchers to HUD for which plaintiffs are entitled to reimbursement.

Blaze and Lodgebuilder argue the court may dismiss Count Seventeen for two reasons. First, they contend there is no proof that Blaze or Lodgebuilder submitted any payment vouchers to HUD because the payment certificates were all signed by members of the HOME Program board, not by Blaze or Lodgebuilder. Second, they argue plaintiffs lack standing to assert the claim under 25 U.S.C. § 88.

Plaintiffs argue all requests for payment were made by representatives of Blaze or Lodgebuilder to the HOME Program, which in turn submitted the requests to HUD for payment by the HOME Program. Thus, plaintiffs argue, if Blaze or Lodgebuilder submitted false requests to the HOME Program, they, in effect, submitted a false payment voucher to HUD. Plaintiffs also argue, in response to the contention that they lack standing, that because the government is not a party to

---

**8.** Plaintiffs allege one of the garbage trucks and the snow plow were purchased with Last Star funds.

the contracts between plaintiffs and Blaze and Lodgebuilder, plaintiffs must seek reimbursement for any improper payments.

With regard to standing, the issue is whether plaintiffs may seek reimbursement of amounts paid after alleged misrepresentations as to amounts owed, or whether the United States is the only party capable of seeking reimbursement under the statute. 25 U.S.C. § 88 provides:

> Any disbursing or other officer of the United States, or other person, who shall knowingly present, or cause to be presented, any voucher, account, or claim to any officer of the United States, for approval or payment, or for the purpose of securing a credit in any account with the United States, relating to any matter pertaining to the Indian Service, which shall contain any material misrepresentation of fact in regard to the amount due or paid, the name or character of the article furnished or received; or of the service rendered, or to the date of purchase, delivery, or performance of service, or in any other particular, shall not be entitled to payment or credit for any part of said voucher, account, or claim; and if any such credit shall be given or received, or payment made, *the United States may recharge the same to the officer or person receiving the credit or payment, and recover the amount from either or from both, in the same manner as other debts -due the United States are collected:* Provided, That where an account contains more than one voucher the foregoing shall apply only to such vouchers as contain the misrepresentation: And provided further, That the officers and persons by and between whom the business is transacted shall, in all civil actions in settlement of accounts, be presumed to know the facts in relation to the matters set forth in the voucher, account, or

claim: And provided further, That the foregoing shall be in addition to the penalties prescribed by law, and in no way affect proceedings under existing law for like offenses. Where practicable this section shall be printed on the blank forms of vouchers provided for general use.

25 U.S.C. § 88 (emphasis added).

In this court's opinion, the underlined language set out above limits recovery on such a claim to the United States. In this regard, the Ninth Circuit Court of Appeals has held that the statute "treats the obligation to pay as a debt due the United States." *United States Fidelity & Guaranty Co. of Baltimore v. United States,* 150 F. 550, 552 (9th Cir.1907). Thus, plaintiffs lack standing to bring an action solely on their own behalf under 25 U.S.C. § 88. For this reason, the motion for summary judgment of Blaze and Lodgebuilder is appropriately granted as it relates to Count Seventeen of plaintiffs' Third Amended Complaint.[9]

### 6. *RICO Violation Claim*

In Count Eighteen of their Third Amended Complaint, plaintiffs allege Blaze and Lodgebuilder engaged in a scheme to defraud plaintiffs in contravention of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*

Blaze and Lodgebuilder argue the claim may be summarily dismissed for two reasons. First, they argue, in a criminal case related to the instant case, a jury acquitted Blaze and Lodgebuilder for alleged RICO violations, thus settling the matter. Second, Blaze and Lodgebuilder argue they could not have committed a RICO violation because they never committed the alleged predicate acts giving rise to the claim, *i.e.* submission of payment requests to HUD.

9. The court finds as an additional ground for this conclusion plaintiffs' failure to cite to any authority for the proposition that Blaze and Lodgebuilder, by submitting alleged false payment vouchers to the HOME Program, in effect submitted false payment vouchers to HUD. As stated elsewhere in this opinion, plaintiffs' representatives independently verified payment requests before forwarding them to HUD for draw downs.

Rather, they argue, the HOME Program submitted all payment requests to HUD. Consequently, plaintiffs have no actionable RICO violation against them.

Plaintiffs argue the verdict in the criminal case did not settle the RICO violation issue because of the differing standards of proof extant between criminal and civil cases. Moreover, they argue that because Blaze and Lodgebuilder made fraudulent payment requests to the HOME Program, which in turn submitted the requests to HUD, Blaze and Lodgebuilder are liable as though they had made the requests themselves.

In briefing this issue, the parties cited no authority for their respective positions. Thus, the court deems it appropriate for the parties to submit supplemental briefs confined to the issue of the viability of plaintiffs' RICO claim. In this regard, plaintiffs and Blaze and Lodgebuilder shall file supplemental briefs on or before September 1, 2000, and shall submit reply briefs on or before September 15, 2000. Counsel shall confine their submissions to no more than ten (10) pages per brief.

### 7. *Punitive Damages Claim*

Blaze and Lodgebuilder argue that plaintiffs' claim for punitive damages may be dismissed if the underlying tort claims fail. Because of the conclusions reached herein relative to plaintiffs' tort claims against Blaze and Lodgebuilder, the court deems it appropriate to deny their motion for summary judgment regarding plaintiffs' punitive damages claim as premature.

### *CONCLUSION*

Based on the foregoing,

IT IS ORDERED that:

1. National Union's motion for summary judgment is GRANTED in part, and DENIED in part, as set forth herein.

2. The motion for summary judgment of Blaze and Lodgebuilder is GRANTED in part, and DENIED in part as set forth herein.

IT IS FURTHER ORDERED that:

Plaintiffs and Blaze/Lodgebuilder shall file supplemental briefs regarding the viability of plaintiffs' RICO claim on or before September 1, 2000, and shall submit reply briefs on or before September 15, 2000. Counsel shall confine their submissions to no more than ten (10) pages per brief.

IT IS SO ORDERED.